STATE OF CONNECTICUT *v.* LAKE SPEARS
(12908)

LANDAU, SPEAR and CRETELLA, Js.

Argued March 28—decision released September 20, 1994

*Richard D. Haviland,* for the appellant (defendant).

*C. Robert Satti, Sr.,* state's attorney, with whom was *Sarah E. Steere,* certified legal intern, for the appellee (state).

LANDAU, J., The principal issue in this appeal is whether the state of Connecticut has acquired criminal jurisdiction over the Mashantucket Pequot Indian reservation in Ledyard. The defendant, Lake Spears, was charged by a substitute information[1] with committing various crimes while on the Mashantucket Pequot reservation. The defendant moved to dismiss the charges, claiming that the court lacked subject matter jurisdiction because the charged offenses were allegedly committed on the Mashantucket Pequot reservation.[2] The

[1] The defendant was arrested initially on a charge of disorderly conduct involving Keri Spears, his wife, a resident of the reservation.

[2] Although the defendant's motion to dismiss advances two separate grounds for dismissal, the defendant acknowledged at oral argument before the trial court that the second claim in the motion, that the alleged conduct needed to have occurred in a public place, was abandoned.

trial court denied that motion, and rendered a judgment of conviction following the defendant's plea of nolo contendere to the charges of interfering with a peace officer in violation of General Statutes § 53a-167a, assault in the third degree in violation of General Statutes § 53a-61, and disorderly conduct in violation of General Statutes § 53a-182. The defendant's plea was entered conditional on his right to appeal the denial of his motion to dismiss.[3]

The following facts are not in dispute. The Mashantucket Pequot Indian tribe is a federally recognized tribe that owns and occupies a tribal reservation containing approximately 1800 acres in Ledyard. The defendant is a member of the Narragansett Indian tribe, and not a member of the Mashantucket Pequot tribe.[4] On November 29, 1991, in response to a telephone call, State Trooper Robert Maynard was dispatched to investigate a disturbance at 8 Elizabeth George Drive, a residential address on the Mashantucket Pequot reservation. Maynard was assisted by Ledyard town constables Sergeant David Guiher and Officers John Craig and William Blanchette. As a result of actions by the defendant, he was arrested by Maynard and Craig, charged, and ultimately presented before the Superior Court. At the time of the defendant's arrest and presentment, he was "an Indian in

---

[3] General Statutes § 54-94a provides in pertinent part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's . . . motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the . . . motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution." See also Practice Book § 4003.

[4] All parties agree that the fact that the defendant is not a member of the Mashantucket Pequot tribe has no legal significance in this appeal.

Indian territory." After the trial court found the defendant guilty on the plea of nolo contendere, the defendant appealed.[5]

The defendant claims that the trial court improperly concluded that the Connecticut Indian Land Claims Settlement Act of 1983[6] (Settlement Act) effected a complete grant of criminal jurisdiction over the Mashantucket Pequot reservation to the state in that it (1) found that the plain meaning of § 6 of the Settlement Act, 25 U.S.C. § 1755,[7] fully subjects the reservation to state criminal jurisdiction, and (2) found that the Mashantucket Pequot tribe has consented to state criminal jurisdiction.

The state asserts that it possesses criminal jurisdiction over the Mashantucket Pequot reservation pursuant to an express grant by Congress in § 6 of the Settlement Act. The state does not claim that the tribe is divested of self-government, or that the tribe cannot

---

[5] On December 15, 1992, the court granted the Mashantucket Pequot tribe's motion to intervene as amicus curiae. The tribe supports the defendant's position that the state lacks subject matter jurisdiction. On February 17, 1993, the court granted the motion filed by the United States government to intervene as amicus curiae. The United States government supports the state's position that the state, and not the federal government, has jurisdiction to prosecute the defendant for state crimes committed on the Mashantucket Pequot reservation.

[6] Public Law 98-134, 97 Stat. 851 (1983), codified at 25 U.S.C. §§ 1751 through 1760. The act is also known as the Mashantucket Pequot Indian Claims Settlement Act. Id. Under the terms of the act, the state contributed twenty acres of public land in Ledyard to establish initially the Mashantucket Pequot reservation. 25 U.S.C. § 1751 (f). Congress identified an additional 800 acres of private land surrounding the initial twenty acres as "settlement lands" to be purchased for the tribe and incorporated into the reservation. 25 U.S.C. §§ 1752 and 1754. Reservation land is held in trust for the tribe by the federal government. 25 U.S.C. § 1757.

[7] Section 6 of the Settlement Act, codified at 25 U.S.C. § 1755, provides: "Notwithstanding the provision relating to a special election in section 406 of the Act of April 11, 1968 [codified at 25 U.S.C. § 1326], the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in title IV of such Act [codified at 25 U.S.C. § 1321 et seq.]."

enact tribal laws that govern the conduct of tribal members, or that the tribe lacks power to enforce such laws.[8]

The parties in this matter are in the curious position of agreeing on the issue, the general principles of law, the relevant authorities and the primary facts. Where the parties differ is on the result that is rendered after the facts are applied to the law.

The defendant claims that the state lacks jurisdiction over criminal offenses committed by Indians while on the Mashantucket Pequot reservation. The state and the defendant agree that states do not have jurisdiction over Indian country unless Congress has specifically authorized such jurisdiction. *Worcester* v. *Georgia,* 31 U.S. 515, 8 L. Ed. 483 (1832). They disagree, however, in regard to the application of § 6 of the Settlement Act. Specifically, they disagree on the issue of

---

[8] In its amicus brief, the United States government claims that it has two interests to protect. The first is in maintaining a correct interpretation of the federal statutes at issue here. It claims that the defendant and the tribe's position is simply an incorrect interpretation of the law. The United States government also claims a strong administrative interest in the outcome of this case because it claims that the logical consequence of the defendant's position is that the state courts also lack jurisdiction over many criminal prosecutions for crimes committed on the reservation by persons who are not Indians; the corollary being that the federal courts and the federal government must assume the burden of these prosecutions. The government asserts that "the issue before the [Appellate Court] has large consequences for the United States. Adoption of the defendant's position would impose a significant burden on the federal judiciary, the federal courts, the United States Attorney's office, the United States Marshals' Service and all other federal law enforcement agencies. Without in any way minimizing the enormous caseload in the state courts, the United States must point out that, based on a system that calculates the weight of each case, the United States District Court for the District of Connecticut had one of the heaviest caseloads per judgeship in the federal judicial system. See, 1991 Federal Court Management Statistics, Administrative Office of the United States Courts, p. 45. Our District Court and its associated personnel cannot easily absorb new area of jurisdiction, especially in criminal cases subject to the Speedy Trial Act. See, 18 U.S.C. § 3161 et seq."

whether § 6 vests the state with jurisdiction over crimes committed by Indians on the Mashantucket Pequot tribe's reservation.

We agree with the defendant, and we arrive at our conclusion by way of the following statutory path. Section 6 of the Settlement Act, codified at 25 U.S.C. § 1755, addresses the issue of the state's jurisdiction over the Mashantucket Pequot tribe. This statute refers to portions of Title IV of the Indian Civil Rights Act of 1968, codified at 25 U.S.C. §§ 1321 through 1326. The dispute in the present case concerns the impact of 25 U.S.C. § 1755 on §§ 401 and 406 of the Indian Civil Rights Act of 1968, codified at 25 U.S.C. §§ 1321 (a) and 1326, respectively. Specifically, the issue before us is whether 25 U.S.C. § 1755 vests the state with criminal jurisdiction over the Mashantucket Pequot tribe notwithstanding the provision contained in 25 U.S.C. § 1321 (a), which otherwise requires that a tribe manifest its consent to jurisdiction prior to a state's assumption of jurisdiction.

We begin our analysis by examining the well established principles that govern state jurisdiction over Indians in Indian country.[9] "Criminal jurisdiction over offenses committed in 'Indian country' . . . is governed by a complex patchwork of federal,[10] state,

[9] "Indian country" is defined in 18 U.S.C. § 1151, which provides in pertinent part: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . ." As a threshold matter, we note that the Mashantucket Pequot tribe is a federally recognized Indian tribe; 25 U.S.C. § 1758; and occupies a reservation of land in Ledyard pursuant to General Statutes § 47-63. The Mashantucket Pequot reservation is, therefore, Indian country to which federal law applies. See 25 U.S.C. § 1152.

[10] For example, the Indian Country Crimes Act, codified at 18 U.S.C. § 1152, extends "the general laws of the United States . . . to the Indian country," except to "offenses committed by one Indian against the person or property of another Indian . . . ." "These latter offenses typically are subject to the jurisdiction of the concerned Indian tribe, unless they are

and tribal law."[11] (Citation omitted; internal quotation marks omitted.) *Negonsott* v. *Samuels,* 507 U.S. 99, 102, 113 S. Ct. 1119, 122 L. Ed. 2d 457 (1993). "As a practical matter, this has meant that criminal offenses by or against Indians have been subject only to federal or tribal laws . . . except where Congress in the exercise of its plenary and exclusive power over Indian affairs has 'expressly provided that State laws shall apply.' " (Citation omitted.) *Washington* v. *Yakima Indian Nation,* 439 U.S. 463, 470–71, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979). "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the state's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *White Mountain Apache Tribe* v. *Bracker,* 448 U.S. 136, 144, 100 S. Ct. 2578, 65 L. Ed. 2d 655 (1980).

In 1953, pursuant to its plenary authority over Indian affairs, Congress enacted Public Law 83-280,[12] the first

among those enumerated in the Indian Major Crimes Act [codified at 18 U.S.C. § 1153]." *Negonsott* v. *Samuels,* 507 U.S. 99, 102, 113 S. Ct. 1119, 122 L. Ed. 2d 457 (1993). "Federal jurisdiction over the offenses covered by the Indian Major Crimes Act is exclusive of state jurisdiction." Id.

The Indian Major Crimes Act, codified at 18 U.S.C. § 1153, provides:

"(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A . . . incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

"(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense."

[11] See, e.g., Mashantucket Pequot Tribal Ordinance (M.P.T.O.) No. 112091-01, M.P.T.O. No. 011092-02, M.P.T.O. No. 113093-03.

[12] Public Law 83-280, 67 Stat. 588-90 (1953), codified, as amended, at 18 U.S.C. § 1162 and 28 U.S.C. § 1360.

federal jurisdictional statute of general applicability to Indian reservation lands; *Bryan* v. *Itasca County,* 426 U.S. 373, 379, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976), and "the primary expression of federal policy governing the assumption by States of civil and criminal jurisdiction over the Indian Nations." *Three Affiliated Tribes of the Fort Berthold Reservation* v. *Wold Engineering,* 476 U.S. 877, 884, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986) *(Three Tribes II).* The primary purpose of that legislation was to address the "problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." Id.; *Washington* v. *Yakima Indian Nation,* supra, 439 U.S. 471; H.R. Rep. No. 848, 83d Cong., 1st Sess., pp. 5–6 (1953). Other purposes of the act were "to [promote] the gradual assimilation of Indians into the dominant American culture and [ease] the fiscal and administrative burden borne by the Federal Government by virtue of its control over Indian affairs." *Three Tribes II,* supra, 886; *Bryan* v. *Itasca County,* supra, 387–88; H.R. Rep. No. 848, supra, pp. 3, 6.

Public Law 83-280, § 2,[13] embodied the provision for state criminal jurisdiction over offenses committed by or against Indians on reservations. *Bryan* v. *Itasca County,* supra, 426 U.S. 380. It effected an immediate grant of criminal jurisdiction over Indian country to five states.[14]

[13] Section 2 of Public Law 83-280 provides in pertinent part: "Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State . . . ." See *Washington* v. *Yakima Indian Nation,* supra, 439 U.S. 471–72 n.9; see also 18 U.S.C. § 1162 and 28 U.S.C. § 1360.

[14] Public Law 83-280 granted criminal jurisdiction to California, Minnesota, Nebraska, Oregon and Wisconsin, with an express exception for the reservations of three tribes. See *Washington* v. *Yakima Indian Nation,* supra, 439 U.S. 471–72 n.9. Alaska was added to this group in 1958. See 18 U.S.C. § 1162 and 28 U.S.C. § 1360.

To the remaining states, it provided an option to assume jurisdiction over criminal offenses in Indian country "without consulting with or securing the consent of the tribes that would be affected." *Washington* v. *Yakima Indian Nation,* supra, 439 U.S. 473–74. Section 7 of Public Law 83-280 established a procedure by which all other states could obtain civil or criminal jurisdiction over Indian tribes: "The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." See *Washington* v. *Yakima Indian Nation,* supra, 474 n.9; *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter,* 217 Conn. 612, 622, 587 A.2d 139 (1991).

In 1968, Congress enacted Title IV of the Indian Civil Rights Act,[15] which repealed § 7 of Public Law 83-280. Title IV requires that all subsequent assertions of jurisdiction be preceded by tribal consent. *Three Affiliated Tribes of the Fort Berthold Reservation* v. *Wold Engineering,* 467 U.S. 138, 144, 104 S. Ct. 2267, 81 L. Ed. 2d 113 (1984) (*Three Tribes I*). "The impetus for the addition of a consent requirement in the 1968 amendments was congressional dissatisfaction with the involuntary extension of state jurisdiction over Indians who did not feel they were ready to accept such jurisdiction, or who felt threatened by it." *Three Tribes II,* supra, 476 U.S. 892, citing S. Rep. No. 721, 90th Cong., 1st Sess., p. 32 (1967). Section 401 of Title IV,[16] which addresses the subject of criminal jurisdiction over Indian country, provides: "The consent of the United

---

[15] Public Law 90-284, 82 Stat. 79 (1968), codified at 25 U.S.C. §§ 1321 through 1326.

[16] 25 U.S.C. § 1321 (a).

States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, *with the consent of the Indian tribe* occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, *and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State."* (Emphasis added.) 25 U.S.C. § 1321 (a). "The method of a state's assumption of criminal jurisdiction is not specified by § 401 [25 U.S.C. § 1321 (a)], but is found in § 406 codified in 25 U.S.C. § 1326[17] . . . ." *Mashantucket Pequot Tribe* v. *McGuigan,* 626 F. Sup. 245, 247 (D. Conn. 1986).

In 1983, Congress enacted the Settlement Act for the purpose of settling tribal claims to much of the private and public lands located in Ledyard. *Mashantucket Pequot Tribe* v. *McGuigan,* supra, 626 F. Sup. 246-47.[18]

[17] Section 406, codified as amended at 25 U.S.C. § 1326, provides: *"Special election.* State jurisdiction acquired pursuant to this [subchapter] with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults."

[18] In *Mashantucket Pequot Tribe* v. *McGuigan,* supra, 626 F. Sup. 245, the plaintiff, an Indian tribe, sought a declaratory judgment and injunctive relief to preclude enforcement of state statutes pertaining to the conduct of bingo games on the plaintiff's reservation. The court held that the state's bingo statutes were regulatory and civil in nature and, therefore,

Section 6 of the act, codified at 25 U.S.C. § 1755, which addresses the subject of state jurisdiction over the Mashantucket Pequot tribe's reservation, provides: *"Notwithstanding the provision relating to a special election in section 406 [of the Indian Civil Rights Act],* the reservation of the Tribe is declared to be Indian country *subject to State jurisdiction to the maximum extent provided in title IV of such Act."* (Emphasis added.)

In the present case, the defendant claims that even if the Settlement Act eliminates the requirement for a special election pursuant to 25 U.S.C. § 1326, it does not eliminate the general consent requirement contained in 25 U.S.C. § 1321 (a). The defendant also claims that since the tribe has never consented to the state's assumption of jurisdiction over offenses committed by Indians on the Mashantucket Pequot reser-

---

unenforceable under a grant of jurisdiction over criminal law. Id., 249. The court did not resolve the issue of whether Connecticut possessed criminal jurisdiction over the reservation; the court expressly reserved the issue of whether the Connecticut Indian Claims Settlement Act, 25 U.S.C. § 1751 et seq., eliminates the consent election requirement provided for in 25 U.S.C. § 1326. *Mashantucket Pequot Tribe* v. *McGuigan,* supra, 246.

We also take notice of the dicta in *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter,* supra, 217 Conn. 615 n.3: "[A] federal district court sitting in Connecticut has held recently that Connecticut has acquired criminal, but no civil, jurisdiction over state Indian tribes [citing *Mashantucket Pequot Tribe* v. *McGuigan,* supra, 626 F. Sup. 249]." Respectfully and regretfully, we do not read the holding in *McGuigan* as does our Supreme Court.

The District Court, Dorsey, J., after opining that "[t]here is a difference between a criminal law which prohibits conduct and imposes penal sanctions if the prohibition is disobeyed, and a law which regulates, controls and/or limits conduct"; id., 248; stated that, "[t]he dominant character of the nature and purpose of Connecticut's bingo laws is regulatory and the single penal statute included therein is not to be considered in isolation. . . . As a regulatory action, Connecticut's bingo laws . . . are found not to be enforceable under a grant of jurisdiction over criminal law." (Citation omitted.) Id., 249. The *McGuigan* court did not reach the issue of criminal jurisdiction because, even assuming that the court did do so, the statutes in question were found to be regulatory rather than criminal.

vation, the state lacks such jurisdiction and, therefore, the defendant's motion to dismiss must be granted.

## I

We first address the issue of whether the Settlement Act dispenses with the special election requirement contained in 25 U.S.C. § 1326. The trial court concluded that the plain meaning of 25 U.S.C. § 1755 "clearly indicates the intent of Congress to dispense with the special election requirement of § 406 [of Title IV of the Indian Civil Rights Act, codified at 25 U.S.C. § 1326]."

"It is the duty of the court to 'interpret statutes as they are written'; *Muha* v. *United Oil Co.*, 180 Conn. 720, 730, 433 A.2d 1009 (1980); and not 'by construction read into statutes provisions which are not clearly stated.' *Glastonbury Co.* v. *Gillies*, 209 Conn. 175, 179, 550 A.2d 8 (1988)." *State* v. *Johnson*, 227 Conn. 534, 542, 630 A.2d 1059 (1993). Where the " 'will of Congress . . . has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.' " *Negonsott* v. *Samuels*, supra, 507 U.S. 104, citing *Griffin* v. *Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S. Ct. 3245, 73 L. Ed. 2d 973 (1982).

Section 1755 of title 25 of the United States Code provides: "Notwithstanding the provision relating to a special election in section 406 of the [Indian Civil Rights Act] . . . ." The plain language of this statute clearly indicates that Congress intended to dispense with the special election requirement that is otherwise required in order for a state to assume criminal jurisdiction over crimes committed by Indians in Indian country. We conclude, therefore, that the trial court properly determined that 25 U.S.C. § 1755 dispenses with the special election requirement contained in 25 U.S.C. § 1326.

## II

We next address the issue of whether the Settlement Act dispenses with the general consent requirement

contained in 25 U.S.C. § 1321 (a). The trial court stated
that " '[t]he primary concern of Congress in enacting
Public Law [83-280] that emerges from its sparse legis-
lative history, was with the problem of lawlessness on
certain Indian reservations, and the absence of ade-
quate tribal institution for law enforcement.' . . .
Since the Settlement Act dispenses with this special
election and grants criminal jurisdiction in the State
of Connecticut without the requirements of any such
vote, it must be concluded that criminal jurisdiction has
been fully vested in the State of Connecticut." Initially,
we note that the language contained in 25 U.S.C.
§ 1755 is ambiguous because, although it "eliminates
the consent election provided in 25 U.S.C. § 1326, it
may have created an anomaly by the fact that it does
not eliminate the consent requirement of 25 U.S.C.
§ 1321 [a]." *Mashantucket Pequot Tribe* v. *McGuigan,*
supra, 626 F. Sup. 248. Since the statutory language
is unclear, we must determine whether Congress
intended to eliminate the general consent requirement
contained in § 401 of Title IV, codified at 25 U.S.C.
§ 1321 (a).

"It is fundamental that statutory construction
requires us to ascertain the intent of the legislature and
to construe the statute in a manner that effectuates
that intent." *State* v. *Johnson,* supra, 227 Conn. 541.
"If the statutory language is unclear, the intent of the
legislature may be ascertained by looking to the legis-
lative history and to the purpose that the statute was
intended to serve." Id., 542. "Furthermore, it is a well
established rule of statutory construction that repeal
of the provisions of a statute by implication is not
favored and will not be presumed where the old and
the new statutes, in this case [25 U.S.C. § 1321 (a) and
25 U.S.C. § 1755], can peacefully coexist." *McCarthy*
v. *Commissioner of Correction,* 217 Conn. 568, 578, 587
A.2d 116 (1991). " 'In the interpretation of a statute,

a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language.' '' Id. "The legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them." *Windham First Taxing District* v. *Windham,* 208 Conn. 543, 554, 546 A.2d 226 (1988).

As we noted previously, Congress enacted Title IV of the Indian Civil Rights Act in response to "congressional dissatisfaction with the involuntary extension of state jurisdiction over Indians who did not feel they were ready to accept such jurisdiction, or who felt threatened by it." *Three Tribes II,* supra, 476 U.S. 892, citing S. Rep. No. 721, 90th Cong., 1st Sess., p. 32 (1967). Congress concluded that tribes were critical of Public Law 83-280 "because it authoriz[ed] the unilateral application of State law to all tribes without their consent and regardless of their needs or special circumstances." Id. (views of Senator Sam Ervin). The Indian Civil Rights Act amended Public Law 83-280 so that any State not presently having civil and criminal jurisdiction over Indian tribes would be required to obtain the consent of the tribes before assuming such jurisdiction. In order to verify that tribal members were in fact "ready to accept such jurisdiction," Congress enacted § 406 of Title IV, 25 U.S.C. § 1326. Section 406 provides that tribal consent may be manifested only by a majority vote of the tribe's enrolled adult Indians, voting in a special election held for that purpose. *Kennerly* v. *District Court of Montana,* 400 U.S. 423, 429, 91 S. Ct. 480, 27 L. Ed. 2d 507 (1971).[19]

---

[19] In *Kennerly* v. *District Court of Montana,* supra, 400 U.S. 425, the United States Supreme Court analyzed the procedures by which "tribal consent" must be manifested under Title IV of the Indian Civil Rights Act; the court held that unilateral legislative action by a tribal counsel "does not comport with the explicit requirements of the Act." In that case, a person who is not Indian brought an action in a Montana state court against two Indians to

Essentially, Congress enacted only one tribal consent requirement, embodied in § 401, codified at 25 U.S.C. § 1321 (a), and one method by which consent must be demonstrated, embodied in § 406, codified at 25 U.S.C. § 1326. "The method of a state's assumption of criminal jurisdiction is not specified by § 401 [25 U.S.C. § 1321 (a)], but is found in § 406 [25 U.S.C. § 1326] . . . wherein the election to effectuate consent is set forth and is mandatory." *Mashantucket Pequot Tribe* v. *McGuigan,* supra, 626 F. Sup. 247. After tribal consent is manifested by the method prescribed in § 406, "the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State."[20] Id.; see 25 U.S.C. § 1321 (a).

In light of the legislative history of the Indian Civil Rights Act and the case law interpreting § 401 of the Indian Civil Rights Act, we conclude that Congress, by enacting 25 U.S.C. § 1755, did not intend to dispense with the general consent requirement embodied in 25 U.S.C. § 1321 (a). "If the legislature had intended by

collect a debt. The Montana Supreme Court ruled that the state court possessed jurisdiction based on a 1967 unilateral act of the tribal counsel. The act of the tribal counsel provides in part: "The Tribal Court and the State shall have concurrent and not exclusive jurisdiction of all suits wherein the defendant is a member of the Tribe which is brought before the Courts." The United States Supreme Court reversed, concluding that the tribe's unilateral act did not comport with the explicit requirements of Title IV of the Indian Civil Rights Act because the "plain meaning" of the statute requires that tribal consent "must be manifested by [a] majority vote of the enrolled Indians within the affected area of Indian country." Id., 427–29.

[20] In *Mashantucket Pequot Tribe* v. *McGuigan,* supra, 626 F. Sup. 247, the court noted the significance of this quoted phrase: "As thus incorporated in § 401 [25 U.S.C. § 1321 (a)], not in a separate sentence, and as unlikely to have a separate effect, independent of the prior provisions of § 401 (a), [this] phrase is construed to describe the force and effect of state law upon fulfillment of the conditions [contained in § 401 (a)]." Id. "This would perhaps be clearer if the word 'then' were inserted such that the quoted phrase read: '. . . and the criminal laws of such state shall *then* have . . . .' " (Emphasis added.) Id.

enacting [25 U.S.C. § 1755] to do away with the long-standing policy of [the general consent requirement], it could easily have said so." See *McCarthy* v. *Commissioner of Correction,* supra, 217 Conn. 578. In fact, Congress did not do so; it merely removed the specific procedure by which tribal consent must be manifested.

### III

Finally, we address the issue of whether the Mashantucket Pequot tribe has consented to the state's assumption of criminal jurisdiction over offenses committed by Indians on the Mashantucket Pequot reservation. Both the state and the defendant cite portions of the Mashantucket Pequot Tribal Ordinance (M.P.T.O.) No. 112091-01[21] to support their argument. As we stated earlier, it is our duty to "interpret statutes as they are written." *Muha* v. *United Oil Co.,* supra, 180 Conn. 730.

---

[21] M.P.T.O. No. 112091-01 provides in pertinent part: *"Section 1(a). Violations of State criminal laws:* Every offense against those criminal laws of the State of Connecticut which are made applicable to the Mashantucket Pequot Reservation by Section 6 of the Mashantucket Pequot Indian Claims Settlement Act [25 U.S.C. § 1755] and 25 U.S.C. § 1321, shall be an offense against the law of the Mashantucket Pequot Tribe and the Mashantucket Pequot Tribe hereby adopts and incorporates by reference, as the law of the Mashantucket Pequot Tribe, all provisions of such criminal laws of the State of Connecticut which are made applicable to the Mashantucket Pequot Reservation by Section 6 of the Mashantucket Pequot Indian Claims Settlement Act."

*"Section 5: Concurrent jurisdiction over State offenses.* The Mashantucket Pequot Tribal Police Department shall exercise concurrent authority with law enforcement officers of the State of Connecticut to make arrests for violations of criminal laws of the State which are made applicable to the Mashantucket Pequot Reservation by Section 6 of the Mashantucket Pequot Indian Land Claim Settlement Act [25 U.S.C. § 1755] and 25 U.S.C. § 1321; provided: however, that persons arrested by officers of the Mashantucket Pequot Tribal Police Department for such violations of criminal laws of the State of Connecticut shall be transferred as promptly as may be feasible to the jurisdiction of State law enforcement officers and the Mashantucket Pequot Tribal Police Department shall comply with all reasonable requirements of State law enforcement officers and agencies in order to assist in the prosecution of such offenders under the laws of the State of Connecticut."

"In the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language." (Internal quotation marks omitted.) *Iacomacci* v. *Trumbull,* 209 Conn. 219, 222, 550 A.2d 640 (1988).

The plain language of M.P.T.O No. 112091-01 does not amount to an "unequivocal expression" of tribal consent. On its face, the ordinance merely appears to acknowledge and address the well established principle that tribal courts lack inherent authority to punish a person who is not Indian on the reservation, and may not exercise such jurisdiction without the consent of Congress. See *Oliphant* v. *Suquamish Indian Tribe,* 435 U.S. 191, 210, 98 S. Ct. 1011, 55 L. Ed. 2d 209 (1978). Absent an unequivocal expression of consent by the tribe, we are unwilling to imply such consent. Our conclusion that the tribe has not consented to such jurisdiction is also supported by the language contained in subsequent tribal ordinances.[22]

We conclude, therefore, that the plain language of the Mashantucket Pequot Tribal Ordinances does not unequivocally express the tribe's consent to the assumption by the state of jurisdiction over offenses committed on the reservation by Indians. Indeed, the plain language of the ordinances expressly denies such consent.

In sum, we conclude that although § 6 of the Settlement Act, codified at 25 U.S.C. § 1755, dispenses with

---

[22] "[T]he tribe . . . has criminal jurisdiction over Indians who commit crimes on the reservation . . . ." M.P.T.O. No. 011092-02. "[T]he Mashantucket Pequot tribe has inherent authority to exercise jurisdiction over criminal matters that arise on the Mashantucket Pequot Tribal Nation Lands . . . the tribe has determined that it will exercise its jurisdiction to the maximum extent permitted by federal law . . . *the tribe has never intended that the State of Connecticut shall exercise criminal jurisdiction within the Nation Lands nor has the tribe by any act consented to the exercise by the state of criminal jurisdiction within the Nation Lands . . . .*" (Emphasis added.) M.P.T.O. No. 113093-03.

the special election requirement of 25 U.S.C. § 1326, it does not dispense with the general consent requirement of 25 U.S.C. § 1321 (a). Since 25 U.S.C. § 1321 (a) requires that tribal consent be manifested prior to "the criminal laws of the state having the same force and effect within Indian country as they have elsewhere within the state," and the Mashantucket Pequot Tribe has never consented to the state's assumption of criminal jurisdiction, we hold that 25 U.S.C. § 1755 does not vest the state with criminal jurisdiction over criminal offenses committed by Indians on the Mashantucket Pequot reservation.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to dismiss.

In this opinion the other judges concurred.